## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

EMPOWER BRANDS LLC f/k/a HPC
BRANDS LLC, a Delaware limited liability
company,

        Plaintiff, Counterclaim-
        Defendant

   v.

TRISTAR PRODUCTS, INC., a Florida
corporation, and KISHORE
MIRCHANDANI, an individual,

        Defendants, Counterclaim-
        Plaintiffs.

Civil Action No. 23-01225-RGA

## MEMORANDUM ORDER

Before me is Plaintiff's Motion to Dismiss Counterclaim. (D.I. 79).[1] I have considered

the parties' briefing. (D.I. 80, 82, 83). For the reasons set forth below, this motion is GRANTED.

Broadly, this case arises out of disagreements between the parties following the February

2022 sale of Defendant Mirchandani's membership interests in his former company, HPC

Brands (now known as Empower), to Spectrum Brands. As a consequence of those

disagreements, Empower filed this suit, which seeks relief based on contract theories. (D.I. 56).

More than a year later, Spectrum filed a separate suit, which seeks relief based on both fraud and

contract theories. Pursuant to Federal Rule of Civil Procedure 42(a), I consolidated the two cases

"for the purposes of discovery including expert discovery." (D.I. 92).

---

[1] All citations to docket items are to the docket in 23-01225-RGA.

1

Mirchandani and Tristar filed the same counterclaims in both cases. The counterclaims assert five counts: (Count 1) Breach of Contract (for breach of the "Independent Contractor Agreement" ("Consulting Agreement")) against Spectrum for failure to pay approximately $250,000 in consulting fees, (Count 2) Breach of Contract (for breach of the "Contribution and Assumption Agreement" ("Contribution Agreement")) against Spectrum and Empower for failure to turn over approximately two million dollars relating to amounts paid by third parties for certain "Excluded Products," (Count 3) Unjust Enrichment against Spectrum and Empower with respect to the unlawful retention of the two million, (Count 4) Breach of Contract (the "Membership Interest Purchase Agreement" ("MIPA")) against Empower for taking actions in bad faith with the primary purpose of avoiding or reducing various post-closing payments to Defendants, and (Count 5) Defendants seek a declaratory judgment against Spectrum and Empower releasing to them approximately $25 million in funds held in an escrow account (referred to as the Indemnity Escrow Amount or "IEA"). (D.I. 71 at ¶¶ 67-101).

Empower argues that any counterclaims against Spectrum should be dismissed because Spectrum is not a party to this action. (D.I. 80 at 3-4). Empower's assertion is correct. Spectrum is not a party to this action, 23-01225-RGA, but to a separate action, 25-00046-RGA.

When I consolidated the two actions for the purposes of discovery, I did so after briefing on the motion to dismiss had already been completed. The fact that I consolidated the two actions for such a limited purpose does not prevent me from dismissing the counterclaims filed against Spectrum in this action. In analyzing the predecessor statute to Rule 42(a) governing consolidation, the Supreme Court held, "We explained that the parties to one case did not become parties to the other by virtue of consolidation." *Hall v. Hall*, 584 U.S. 59, 72 (2018).

2

"Rule 42(a) did not purport to alter the settled understanding of the consequences of consolidation." *Id.* at 78.

Defendants note, "In any event, even if the Court dismisses the Counterclaims against Spectrum in this case, those claims may still proceed against Spectrum in [25-00046-RGA] . . ., while all counterclaims against [Plaintiff] may proceed in this case." (D.I. 82 at 3). I agree; such being the case, I dismiss all counterclaims without prejudice in this case against Spectrum. Thus, since Empower was not named in Count 1 of the Counterclaims, I only need to consider Defendants' arguments relating to the other four counterclaims.

Empower (hereinafter referred to as "Plaintiff") argues that Counterclaim Counts 2, 3, and 4 are barred by the provisions of the MIPA's indemnification provisions (D.I. 80-1) that memorialized the initial sale. (D.I. 80 at 4). Specifically, Plaintiff argues that the counterclaims "are barred because the 'sole and exclusive remedy' for them is through the indemnification provisions in the MIPA, with which Defendants failed to comply." (*Id*). Plaintiff's arguments are primarily based upon two sections of the MIPA; I quote the relevant portions here.

> Subject to the limitations and other provisions of this Agreement, the representations and warranties contained herein shall survive the Closing and shall remain in full force and effect until the date that is eighteen (18) months from the Closing Date. . . . All covenants and agreements of the parties contained herein that by their nature are required to be performed after the Closing shall survive the Closing in accordance with their express terms. Notwithstanding the foregoing, any claims asserted in good faith with reasonable specificity (to the extent known at such time) and in writing by notice from the nonbreaching party to the breaching party prior to the expiration date of the applicable survival period shall not thereafter be barred by the expiration of the relevant representation or warranty and such claims shall survive until finally resolved.

(D.I. 80-1, § 9.1)

> Notwithstanding anything contained in this Agreement to the contrary, after the Closing, indemnification pursuant to the provisions of this ARTICLE IX shall be the sole and exclusive remedy for the parties hereto for any misrepresentation or breach of any warranty, covenant or other provision contained in this Agreement

or in any certificate delivered pursuant hereto and for any claims with respect to the transactions contemplated by this Agreement, except for Fraud. Nothing in this ARTICLE IX shall affect any liability or obligation of any Person arising under or with respect to any other Document.

(*Id.* at § 9.5)

Plaintiff argues that since the counterclaims were covered by these provisions of the MIPA, Defendants were required to have "provide[d] [Plaintiff] written notice of any claim with reasonable specificity" prior to the expiration date of August 18, 2023.[2] (D.I. 80 at 5). Plaintiff avers that Defendants failed to do so: The counterclaims do not allege a claim for indemnification, which expired on August 18, 2023. "They . . . failed to provide written notice of any such claims for indemnification prior to that date, despite being aware of them. In fact, . . . the only notice Defendants allege was in a letter dated September 12, 2023—a month after the expiration of any indemnification obligations." (*Id.*)

Defendants argue that this argument rests upon a misreading of Section 9.5 of the MIPA, specifically focusing on the statement, "Nothing in this ARTICLE IX shall affect any liability or obligation of any Person arising under or with respect to any other Document." (D.I. 82 at 4, D.I. 80-1 at § 9.5). Count 2 and Count 3 of the counterclaims did not arise from the MIPA, but rather separate documents, and, so Defendants' argument goes, "these claims are not subject to the MIPA's Exclusive Remedy provision, and Defendants were not required to pursue them through Article IX's indemnification process." (D.I. 82 at 5).

I disagree with Defendants. As Plaintiff points out in its Reply Brief,

Section 9.5 explicitly states that the indemnification provisions of Section 9 of the MIPA provide the "Exclusive *Remedy*" for the breach of any covenants contained in the MIPA and "for any claims with respect to the transactions contemplated [by this Agreement.]" . . . The sentence on which Defendants rely says "[n]othing in

---

[2] The MIPA was signed February 3, 2022. (D.I. 80-1 at 1). The Contribution Agreement was signed February 18, 2022. (D.I. 80-2 at 1). The expiration date is based on the latter agreement.

this ARTICLE IX shall affect any *liability or obligation* of any Person or with respect to any other document," but says nothing about affecting the *remedy* provisions of Section 9.

(D.I. 83 at 3).

This seems correct to me. Defendants concede, "Count II arises under the Contribution Agreement" (D.I. 82 at 4-5), which is listed as having been attached as "Exhibit A" to the MIPA. (D.I. 80-1 at Table of Contents). "Meanwhile, Count III is an extracontractual claim for unjust enrichment based on the same factual allegations as Count II." (D.I. 82 at 5). Defendants appear to be hinting at an argument that, perhaps, Counts 2 and 3 are not claims related "to the transactions *contemplated*" by the MIPA, but they don't outright make this argument. Regardless, even if they had, it would have been a losing argument. The Contribution Agreement explicitly recites that it is entered into "with respect to the foregoing," with "the foregoing" being the sale memorialized in the MIPA. (D.I. 80-2 at 1). I fail to see how Defendants could possibly argue that Counts 2 and 3 do not constitute such "claims with respect to the transactions contemplated [by the MIPA]". (D.I. 80-1 at § 9.5).

Defendants do not argue that they did in fact pursue their claims through the MIPA's Article 9 indemnification process. They make no reference to having done so in their counterclaim. Their entire argument depends on the mistaken assumption that they "were not required to pursue them through Article XI's indemnification process." (D.I. 82 at 5). This dependency is fatal to their argument. I dismiss Counts 2 and 3 of Defendants' counterclaims.

Whether Count 4 states a claim is somewhat more complicated. While the time period to make claims for indemnity expired on August 18, 2023, Section 9.1 of the MIPA specifically notes that "any claims asserted in good faith with reasonable specificity . . . and in writing by notice . . . prior to the expiration date of the applicable survival period shall not thereafter be

5

barred by the expiration of the relevant representation or warranty." (D.I. 80-1 at § 9.1). Count 4 was brought for breach of Section 2.8(h) of the MIPA, which states, "During the period from the Closing Date until December 31, 2023, [Plaintiff] shall conduct its business and operations in good faith and . . . shall not . . . take any action in bad faith and with the primary purpose of avoiding or reducing the Post-Closing Payment Amounts." (*Id.* at § 2.8(h)). Defendants thus argue, with respect to Count 4, "[Plaintiff's] obligation to act in good faith . . . expressly survived through [December 31,] 2023 and did not terminate on August 18, 2023. Moreover, as [Plaintiff] acknowledges, [Defendant] Tristar did give notice of potential claims against [Plaintiff] under Section 2.8(h) in a letter dated September 12, 2023." (D.I. 82 at 6). Plaintiff replies, "While Defendants note that [they] did give notice of potential claims against [Plaintiff] . . . in a letter dated September 12, 2023 . . . they do not argue or plead that [Defendant] Tristar sought indemnification in that letter. . . . Because Defendants did not seek indemnification . . . before December 31, 2023, Count IV should be dismissed." (D.I. 83 at 4) (cleaned up).

Section 9.1 of the MIPA, however, does not contain language requiring that Defendants have sought indemnification before December 31, 2023. All that it says is that the "claim" in question must be "asserted in good faith with reasonable specificity . . . and in writing by notice from the non-breaching party to the breaching party." (D.I. 80-2 at § 9.1). As this provision of the MIPA is literally written, so long as a claim has been "asserted" and "notice" of that claim has been given "in writing," "such claim[] shall survive until finally resolved." (*Id.*). Thus, Sections 9.1 and 9.5 of the MIPA do not bar Count 4 of Defendants' counterclaims, given that Defendants had given Plaintiff notice of Defendants' claims in the September 12, 2023 letter.[3]

---

[3] The letter of September 12, 2023, is in the record. (D.I. 10-4). It clearly gives notice of the claim in Count 4. (*Id.* at 3).

6

Plaintiff next asserts that Count 4 fails to adequately plead any alleged "bad faith." (D.I. 80 at 9). Count 4 alleges,

> Under Section 2.8(h) of the MIPA, [Plaintiff] was obligated not to "directly or indirectly[] take any action in bad faith and with the primary purpose of avoiding or reducing the Post-Closing Payment Amounts." . . . On information and belief, [Plaintiff] acted in bad faith and/or with the primary purpose of avoiding the Post-Closing Payment Amounts. . . . [Plaintiff's] gross mismanagement constituted arbitrary or unreasonable conduct, as a result of which [Defendants] did not receive the full benefit of the bargain.

(D.I. 71 at ¶¶ 86, 88, 90).

Plaintiff argues that Defendants were required to satisfy the heightened requirements of Rule 9(b) for fraud, "because the bad faith [Plaintiff] is accused of is premised on a theory of fraudulent inducement. . . . Indeed, [Defendants] explicitly accuse[] [Plaintiff] of fraudulently inducing [Defendant]." (D.I. 80 at 10) (emphasis removed). Plaintiff bases this reading off the following statement in Defendant's counterclaims: "While [Plaintiff's] Complaint . . . wrongfully accuses [Defendants] of 'fraudulently induc[ing] [Plaintiff]' to buy [Defendants'] kitchen appliance business and concealing the forecasted EBITDA of [Defendants'] kitchen business, the opposite is true." (D.I. 71 at 7). According to Plaintiff, this line is tantamount to Defendants accusing Plaintiff "of fraudulently inducing [them] into executing the MIPA." (D.I. 80 at 10). "[T]he only reasonable interpretation of the Counterclaim's statement that 'the opposite is true' is that [Plaintiff] somehow fraudulently induced [Defendants]." (D.I. 83 at 5-6).

This argument does not withstand any degree of scrutiny. Consider the following sentence: "While the prosecutor wrongfully accuses the defendant of being the leader of the gang, the opposite is true." The natural reading of this sentence is that the defendant was not in fact the leader of the gang; it is not that the prosecutor was accused by the defendant of being the leader of the gang. Moreover, the extent to which Plaintiff's misinterpretation ignores the context

7

of Defendants' words is brought into sharp relief when the sentence at issue is analyzed in light of what immediately follows:

> While [Plaintiff's] Complaint . . . wrongfully accuses [Defendants] of "fraudulently induc[ing] [Plaintiff]" to buy [Defendants'] kitchen appliance business and concealing the forecasted EBITDA of [Defendants'] kitchen business, the opposite is true. [Plaintiff] . . . pursued the deal with eyes wide open having done extensive due diligence, itself having access to and compiling all of [Defendants'] accounting information for the deal.

(D.I. 71 at 7).

It is obvious that Defendants meant nothing more by the phrase, "the opposite is true," than a "simpl[e] refer[ence] to how far from the truth [Plaintiff's] 'fraudulent inducement' theory is." (D.I. 82 at 9). Count 4 does not sound in fraud and consequently is not subject to the heightened pleading standards as required by Rule 9(b).

Nevertheless, Plaintiff argues that even if Rule 9(b) does not apply, Defendants failed to allege facts that could plausibly establish that Plaintiff acted in "bad faith." Plaintiff argues that all Defendants did is allege facts showing that Plaintiff engaged in "gross mismanagement." (D.I. 80 at 12). There is some substance to this argument, as Count 4 accuses Plaintiff of "gross mismanagement of the acquired Business" in "rejecting the DTC [direct-to-consumer] process, reducing the advertising and promotions budgets, failing to innovate and promote new products, and firing [Defendants'] employees, including the [Defendants'] sales teams which had generated millions in sales." (D.I. 71 at ¶ 89).

Plaintiff argues that, at most, "'gross mismanagement' is synonymous with 'gross negligence,' and does not rise to the level of 'bad faith.'" (D.I. 80 at 12). Plaintiff cites no authority in support of this proposition, however.[4] I have not found any case applying Delaware

---

[4] In its Opening Brief, Plaintiff cites *Jaroslawicz v. M&T Bank Corp.*, 2017 WL 1197716, at *7 (D. Del. Mar. 30, 2017) for the proposition, "'[g]rossly negligent conduct, without more, does

law in support of this proposition, and Defendant has cited several cases in which courts applying Delaware law have concluded that a claim that a business was "grossly mismanaged" implicates a potential breach of the covenant of good faith and fair dealing. (D.I. 82 at 11). For example, the Northern District of California declined to dismiss a claim for a breach of the covenant of good faith and fair dealing under the guise that the claimed "gross[] mismanage[ment]" actually constituted "a negligence claim" that might have been barred under Delaware law. *See Miranda v. U.S. Sec. Assocs.*, 2019 WL 1960351, at \*14-16 (N.D. Cal. May 2, 2019). As such, Defendants argue that they have "done more than enough to plead a claim for breach of the implied covenant of good faith and fair dealing." (D.I. 82 at 12).

That may be the case, but Defendants have styled Count 4 as a "Breach of Contract" claim, even as, somewhat confusingly, they allege in Count 4 that "[Plaintiff] breached the implied covenant of good faith and fair dealing which inheres in every contract under Delaware law." (D.I. 71 at 30, ¶ 91). Plaintiff argues that this confusion requires dismissal of Count 4, "because it is unclear whether the claim is based on the implied covenant of good faith and fair dealing . . . or a breach of Section 2.8(h)." (D.I. 83 at 6). Delaware Courts have held, however, "A claim for breach of the implied covenant [of good faith and fair dealing] is a claim for breach of contract. The only difference is the source of the provision." *Cygnus Opportunity Fund, LLC v. Washington Prime Grp., LLC*, 302 A.3d 430, 457 (Del. Ch. Aug. 9, 2023). "Because a claim for breach of the implied covenant is contractual, the elements are those of a breach of contract claim." *Whitestone REIT Operating P'ship, L.P. v. Pillarstone Capital REIT*, 2024 WL 274228,

---

not and cannot' establish bad faith." (D.I. 80 at 12). In its Reply Brief, Plaintiff cites to the same case and states that "the unrebutted caselaw in [Plaintiff's] Opening Brief makes clear that gross mismanagement is not the same as bad faith." Plaintiff overreaches. Plaintiff has not shown that "gross mismanagement" is synonymous with "grossly negligent conduct" or gross negligence, and *Jaroslawicz* does not stand for this proposition.

at * 7 (Del. Ch. Jan. 25, 2024). I therefore decline to dismiss Count 4 on the grounds that

Defendants mistitled Count 4. It is correctly titled. It simply recites two different sources for

what is essentially one theory.

The Supreme Court of Delaware has stated the following with respect to the implied

covenant of good faith and fair dealing.

> The implied covenant of good faith and fair dealing involves a "cautious enterprise," inferring contractual terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated. "[O]ne cannot generally base a claim for breach of the implied covenant on conduct authorized by the agreement." We will only imply contract terms when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected.

*Nemec v. Shrader*, 991 A.2d 1120, 1125-26 (2010).

Plaintiff argues that Defendants' Count 4 fails, because "there are explicit covenants [or

contractual provisions] that address the conduct" at issue, i.e., Section 2.8(h) of the MIPA. (D.I.

83 at 7). I reproduce the relevant portion of Section 2.8(h) below.

> During the period from the Closing Date until December 31, 2023, the Company shall conduct its business and operations in good faith and the Company shall not, directly or indirectly, take any action in bad faith and with the primary purpose of avoiding or reducing the Post-Closing Payment Amounts; provided, however, (x) the Company shall be entitled to determine in its sole discretion at any time and from time to time during such period the amount of marketing, advertising and promotional support for each Designated Product, the number of each Designated Product to be produced and the price of each Designated Product in its sole discretion and any such determination shall not be deemed to have been taken with the primary purpose of avoiding or reducing the Post-Closing Payment Amounts; provided that in no event shall the amount of advertising expense of the Company for the Designated Products for calendar year 2022 or 2023 be less than 8% of the net sales of Designated Products by the Company for the applicable year[.]

(D.I. 80-1 at § 2.8(h)).

It seems clear to me that the MIPA had an explicit covenant to address what was required

in relation to Post-Closing Payment Amounts, including that "the Company [not] take any action

10

in bad faith and with the primary purpose of avoiding or reducing" those payments. There is no basis for implying a covenant that parallels an explicit contractual provision.

Defendants allege "gross mismanagement" on the grounds that Plaintiff (1) rejected the direct-to-consumer marketing process, (2) reduced the advertising and promotions budget, (3) failed to innovate and to promote new products, and (4) fired [Defendants'] employees, including the sales team. (D.I. 71 at ¶ 89). I think that (1), (2), and (4) in part (at least with respect to firing the sales team) are plainly covered and consigned to Plaintiff's "sole discretion" by Section 2.8(h) of the MIPA, and I thus find that these are plainly insufficient to support a claim for breach of the explicit covenant.

As to (3), I don't think that a failure to innovate and to promote new products is sufficient to state a claim for a breach of the explicit covenant. Nor can this allegation suggest an implied covenant here. There is simply no indication that, in failing to innovate and to promote new products, Plaintiff acted "arbitrarily or unreasonably." *Nemec*, 991 A.2d at 1126. To the extent that there is, Defendants at any rate have failed to indicate the grounds for some implied covenant that Plaintiff was under some obligation to innovate and to promote new products. Similarly, with respect to (4), Defendants themselves note in their Counterclaim, "To make up for the lost EBITDA . . ., [Plaintiff's CEO] fired [Defendants'] salespeople, along with [Defendants'] social media marketing team; raised prices . . .; severely reduced the advertising and promotional budgets[,] and stopped bringing in inventory." (D.I. 71 at 11). Defendants are talking out of both sides of their mouths. They cannot both attribute to Plaintiff a plausible business reason for acting as it did while simultaneously stating that this course of action constituted such gross mismanagement that it violated an implied covenant, i.e., that it was done "arbitrarily or unreasonably." Nor do Defendants' *ipse dixit* conclusions, that Plaintiff's (perhaps

11

suboptimal) business judgments were "gross mismanagement [that] constituted arbitrary or unreasonable conduct," somehow alchemize their assertions of fact into a viable claim. (*Id.* at ¶ 90). After all, a viable claim "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). I dismiss Count 4 of Defendants' counterclaims.

Finally, in Count 5, Defendants seek a declaratory judgment against Spectrum and Plaintiff as to $25 million held in an escrow account. I have already dismissed all claims in this case against non-party Spectrum. This presents a conundrum for Defendants; in their counterclaim, they expressly note, "In conjunction with the MIPA, Spectrum and [Defendants] also entered into [the] Escrow Agreement." (D.I. 71 at ¶ 94). As Plaintiff points out,

> [Plaintiff] is not a party to the Escrow Agreement and it thus has no obligations thereunder with respect to the [Escrow Account] . . . [T]he Escrow Agreement defines the obligations . . . [in relation to] Spectrum and [Defendants] alone. There is thus no declaration that the Court can give as to [Plaintiff] that could ever cause the release of the [Escrow Account]—any such declaration would need to be directed at Spectrum and [Defendants].

(D.I. 80 at 16-17). Plaintiff points out in its Reply Brief (D.I. 83 at 10) that Defendants do not even reply to this argument in their Answering Brief. I agree with Plaintiff. I dismiss Count 5 of the counterclaims.

All counterclaims are dismissed without prejudice. Defendants request leave to amend (D.I. 82 at 15), but as they have not proposed any particular amended complaint, I have no basis

12

to grant that request. Should Defendants within fourteen days file a motion to amend their

counterclaims, I will consider it then.

   IT IS SO ORDERED.

Entered this 11th day of August, 2026

_____
United States District Judge